## LILLY HEWAHEWA *v.* SOLOMON K. LALAKEA.

### No. 1447.

ERROR TO CIRCUIT COURT FOURTH CIRCUIT.
HON. J. W. THOMPSON, JUDGE.

ARGUED JUNE 15, 1923.                    DECIDED OCTOBER 15, 1923.

PETERS, C. J., LINDSAY, J., AND CIRCUIT JUDGE ANDRADE IN PLACE OF PERRY, J., DISQUALIFIED.

APPEAL AND ERROR—*review—question of fact—findings.*

The decision of the circuit judge jury waived will not be set aside on appeal where there is evidence to support it.

SAME—*review as depending on mode of review.*

Upon writ of error this court·is prohibited under the provisions of section 2523, R. L. 1915, as amended by Act 44, S. L. 1919, from reversing any finding depending upon the credibility of witnesses or the weight of evidence and assignments of error to findings of fact will not be disturbed if sustained by evidence more than a scintilla.

DEEDS—*requisites and validity—execution—signature.*

It is not essential to the validity of a deed that the grantor should actually affix his signature thereto with his own hand unassisted but the deed will be binding upon him if he affixes his signature while another at his request guides his hand in so doing.

APPEAL AND ERROR—*review—harmless error—findings of fact.*

Where the judgment is supported by proper findings it is not vitiated by findings on immaterial points; such findings may be treated as surplusage.

Opinion of the Court.

DEEDS—*requisites and validity—delivery—sufficiency.*

> Where the court found as facts a manual delivery coupled with the intent in the grantor to part with all dominion and control over the deed and to make the same effective as a present conveyance of the premises subject thereto there has been a sufficient delivery of the deed.

SAME—*same—same—same.*

> Where a deed contains a reservation of a life estate in the grantor such fact raises a strong presumption that it was intended that the title should vest in the remainderman.

JUDGMENTS—*conclusive of adjudication—cotenants.*

> The burden of proving a former adjudication is on the party setting it up.

SAME—*same—same.*

> Tenants in common do not claim through or under each other and therefore there is no privity between them that a judgment for or against one of them affecting the land will bind or redound to the benefit of the other.

OPINION OF THE COURT BY PETERS, C. J.

This is an action at law to quiet plaintiff's title to an undivided one-seventh interest in fee in and to the entirety of or undivided moieties in twenty-five pieces of real property enumerated in the schedule attached to the complaint.

Both parties claim through a common source of title—their father T. K. Lalakea who died May 7, 1915, intestate—the plaintiff as one of his heirs at law, the defendant as grantee in a deed of the premises in question alleged to have been executed and delivered by his father to him on March 6, 1915.

The heirship of plaintiff and the quantum of interest claimed by her provided the intestate died seized of the premises in question are conceded by the defendant. The plaintiff claimed that the deed to the defendant was never executed and/or delivered to him by the intestate, in short that it was a forgery, and even if valid was testamentary in character, that is, a will and not a deed.

The cause was tried jury waived in the fourth circuit court, the Honorable James W. Thompson of the third circuit substituting for the Honorable Homer L. Ross, judge of the former court, disqualified.

The issues were confined to those of execution and delivery of the deed under which defendant claims.

Upon the opening of the trial the parties filed the following stipulation of facts:

"1.   That T. K. Lalakea in his lifetime was seized of the property described in the plaintiff's declaration;

"2.   That the said T. K. Lalakea departed this life May 7, 1915, intestate, leaving as his heirs at law the following named persons:

| | | |
|---|---|---|
| 1 | Solomon K. Lalakea, | a son, |
| 2 | Lilly Hewahewa, | a daughter, |
| 3 | Jennie K. Aona, | a daughter, |
| 4 | Hannah Makainai, | a daughter, |
| 5 | George Lalakea, | a son, |
| 6 | Jack Kawaha, Kamaunu Kawaha, alias Kanamu Kawaha, Kauoho Keaulani Kawaha, Maemae Kawaha, | Children of a deceased daughter, |
| 7 | Lily Rose Hewahewa, alias Lily Aiau, Thomas Aona, alias Thomas Aiau, | Children of a deceased daughter, |
| 8 | Maria Lalakea, | a daughter; |

"3.   That after the decease of the said T. K. Lalakea and before the commencement of this action the said Maria Lalakea departed this life intestate, leaving the persons named above, except herself, as her heirs at law;

"4.   That if the defendant shall offer evidence of a purported deed alleged to have been executed by T. K. Lalakea to Solomon K. Lalakea, defendant herein, March 6, 1915, and if such evidence shall be accepted by the court, then it is agreed that section marked 8 of the description of the various parcels of property therein shall be consid-

ered by the court as intended by the said T. K. Lalakea to convey the one-half interest in the property described in section 26 of plaintiff's declaration, if the said T. K. Lalakea by said instrument conveyed any property whatsoever;

"5.    That the declaration shall be amended by striking out section 8 of the schedule describing the property."

Thereupon plaintiff rested.    The defendant having introduced in evidence the deed to him of March 6, 1915, rested.    Thereafter both parties offered evidence for and against the execution and delivery of the deed in question.

The court rendered a decision holding in effect that the deed to Solomon K. Lalakea was duly executed and delivered to him by his father, T. K. Lalakea, and ordered judgment accordingly for the defendant.    The plaintiff prosecuted error.

The trial court's decision with inclusive parentheses indicating the findings of fact complained of and the number of the corresponding assignment of error is as follows:

"This cause came on to be heard on January the 16th, 1922, and the hearing continued from day to day until completed.    No jury was demanded, hence the hearing was by the court.    Certain witnesses were sworn regularly and heard—certain documents were submitted, and after a full and complete hearing the court took the matter under advisement.    After the court had waited for more than one and a half months for briefs and none were filed, the court undertook to pass upon the law and the facts involved without the aid of such briefs.

"The plaintiff claims a one-seventh undivided interest in all the property set out in the bill of complaint, and asks the court to so adjudge and decree.

"It is agreed and stipulated by both parties to the cause, that this property, as set out, was formerly the property of T. K. Lalakea, and that the said T. K. Lalakea was the father of both plaintiff and defendant, and that if the plaintiff was entitled to any part of the prop-

erty set out she would be entitled to a one-seventh part—and that the said T. K. Lalakea died May 7th, 1915.

"Certain alleged deeds—the deeds to the tracts of land set out in the bill of complaint, were presented for the consideration of the court.

"It appears to the court, from all the evidence, that as many as five deeds were prepared by Mr. O. T. Shipman, an attorney at law, at the request of the said T. K. Lalakea, and were delivered to the said T. K. Lalakea, in blank, however, at the home, and to the person of the said T. K. Lalakea, he being at that time not able physically to leave his house, said deeds undertaking to convey all of his real estate to his several children individually.

("It further appears that the said T. K. Lalakea was a county official at that time and") (Assignment No. 3) "that he had instructed Mr. O. T. Shipman to draw said deeds—(that he wanted to dispose of his property—that he feared his deputy was involved, but that he himself was responsible for the funds of his office and that he wanted to save his property if anything happened") (Assignment No. 3 continued) "or words to that effect."

("It appears from the deeds themselves that on March 6th, 1915, the said T. K. Lalakea did sign the said deeds, in the presence of Solomon K. Lalakea and one Namahoe.") (Assignment No. 4) ("These deeds were presented in evidence and the said Solomon K. Lalakea and Namahoe appeared as witnesses and identified their own signatures as witnesses to the signature of T. K. Lalakea.") (Assignment No. 5)

("The said T. K. Lalakea signed several of the deeds at the same time, conveying certain other pieces of property to his other children.") (Assignment No. 6) ("At that time he was so weak and physically impoverished that his hand had to be held and guided so that he could write at all.") (Assignment No. 7)

("All the deeds were actually delivered to the defendant, Solomon K. Lalakea, and held by him until after the death of the old gentleman.") (Assignment No. 8).

"The said T. K. Lalakea died on the 7th day of May, 1915. (He was never physically able to leave the house,

scarcely able to sit up at all, between the times of signing said deed and the day of his death.)" (Assignment No. 9)

("Among the list of deeds made and signed and delivered as above set out was one to the plaintiff conveying the property in question.") (Assignment No. 10)

("On the 8th day of May, 1915, Solomon K. Lalakea with the other heirs, and witnesses, appeared in court before his Honor Charles F. Parsons, then judge of this court, and did perfect by process of court, as provided by the Revised Statutes of the Territory of Hawaii, all of the aforesaid deeds") (Assignment No. 11) and ("each heir, the plaintiff and defendant alike, accepted their deeds, and have enjoyed ever since the benefits growing out of said conveyances.") (Assignment No. 12)

("From the above statement of facts the court is unable to see that any fraud was committed by the defendant. There is nothing in the court's mind other than to give full credit to the testimony, to the evidence, given by Solomon K. Lalakea and Namahoe with reference to the signature of T. K. Lalakea as testified to by them.") (Assignment No. 13)

("The court is without authority to imagine that a fraud was committed.") (Assignment No. 14)

("In order to establish fraud, something more than a few suspicious circumstances must be shown. All of the so-called suspicious circumstances were reasonably explained without doing violence to any legal presumptions.") (Assignment No. 15)

"Courts cannot go out hunting for suspicions and build thereon structures and call them frauds. Courts are looking for facts as presented by testimony. Every witness is presumed to speak the truth and the court must give full credence unless something appears to the contrary of a more substantial nature than a slightly suspicious act. (Here, we have the testimony of two witnesses as to the signature of T. K. Lalakea to the deeds, and no testimony to the contrary,—only a few suspicious steps that lose much of their misgiving under explanation. The court, is, therefore, of the opinion that no fraud was

shown, and, consequently, none committed.)" (Assignment No. 16)

("About all the evidence on the question of delivery is the testimony of Solomon himself, and that was after the deeds were signed by his father. A rubber band was placed around all the deeds collectively and they were handed to him with instructions to keep them. He did keep them and he had them, according to all of the testimony, continuously till after the death of the old gentleman.") (Assignment No. 17) ("The court is, therefore, bound to accept the testimony, as presented, and conclude that the deed in question was legally delivered by the said T. K. Lalakea to the defendant, Solomon K. Lalakea, in full satisfaction and contemplation of the laws of this Territory, and for the purposes as set out in the deed itself.") (Assignment No. 18)

("It is quite clear to the mind of the court that the old gentleman, as he said, wanted to dispose of his property before he died—") (Assignment No. 19) ("that he did not want his estate subjected to any shortage that his deputy in office might involve him in.") (Assignment No. 20)

("The court is of the further opinion that the said T. K. Lalakea at the time of signing said deeds wanted to convey without reservation the title of various pieces of real estate to his various children, the lands in question to the defendant included,—and that he thought he was so conveying.") (Assignment No. 21) ("He tried to write his name to said deeds and found he could not— realizing his condition and not wanting to be further troubled with the matter he then gave Solomon K. Lalakea instructions, in the presence of Namahoe, what to do with them, and then and there delivered the said deeds to the defendant.") (Assignment No. 22) ("The court, is, therefore, of the opinion that the deed in question is not testamentary—is not a will but a deed.") (Assignment No. 23)

("The court having considered and passed upon singly every material point raised in the cause, is of the opinion that the plaintiff has not made out a case under the law,

pleadings and testimony by a preponderance of evidence.")
(Assignment No. 24)

("Let judgment be entered in favor of the defendant
and against the plaintiff, dismissing the action.")    (As-
signment No. 25)

The findings of fact contained in the foregoing opinion,
except as hereinafter qualified, we find to be sustained
by the evidence.

There are but four questions involved upon this ap-
peal under which the assignments of error naturally
group themselves.

First.   Did T. K. Lalakea execute the alleged deed
of March 6, 1915, under which the defendant claims? in-
volving assignments of error numbers 3, 19, 20, 7, 9 and
a portion of number 22 to the findings of fact of the trial
court as to the general surrounding circumstances and the
physical condition of the deceased at and immediately
prior to the time of the alleged execution; assignments
numbers 4, 5, 6 and 10 to the findings of fact that the
deceased signed said deed and deeds to his other children
at the same time; assignments numbers 13, 14, 15 and
16 to the findings upon the absence of fraud by the de-
fendant in respect to such signature of the deceased and
finally assignment number 1 to the court's conclusion of
law that T. K. Lalakea executed said alleged deed.

Second.   Did T. K. Lalakea deliver said alleged deed
of March 6, 1915, to the defendant? involving assignment
of error number 17 to the court's finding of what it con-
sidered to be the controlling evidence in the case and with
assignment number 8 and a portion of assignment number
10 to the finding of fact that T. K. Lalakea manually de-
livered said alleged deed to the defendant, that portion of
assignment number 22 which refers to delivery, assign-
ment number 11 to the court's finding upon the question
of acknowledgment, number 12 upon the acceptance by the

other children of the deceased of deeds executed to them at the same time as that executed to the defendant and finally assignments numbers 2 and 18 to the conclusion of law by the trial court that the said T. K. Lalakea delivered said alleged deed to the defendant.

Third.  Is the said alleged conveyance to the defendant of March 6, 1915, a will or deed? involving assignment number 21 to the finding of fact that the grantor intended to convey absolutely all his property to his children including the property in question to the defendant and assignment number 23 to the conclusion of law that the document was a deed and not a will.

Fourth.  Was the trial court bound by its judgment in favor of plaintiff in the case of Jessie Makainai v. Solomon Lalakea, an action of ejectment brought by plaintiff against the same defendant in this case for her interest, similarly as this plaintiff, as heir at law of the said T. K. Lalakea in the same land described in the complaint? involving assignment of error number 26.

Assignments numbers 24 and 25 are general assignments and depending as they do upon the disposition of the other assignments will not be considered independently.

The questions necessary to our decision and the assignments of error respectively involved thereunder will be considered in the order named.

1.  Did T. K. Lalakea execute the alleged deed under which the defendant claims?

Both upon argument and in her brief plaintiff in error apparently assumed that this appeal contemplated a review *de novo* of the facts and it may not be amiss at this time to again note the effect of the decision of a circuit court jury waived.  Prior to Act 117, S. L. 1909, amending section 1747, R. L. 1905, it was customary, with but few exceptions, for circuit judges rendering their decisions

in term cases tried jury waived to merely state in whose favor the issues of fact and law were determined upon which judgment was entered accordingly by the clerk. By an unbroken line of decisions from *Briggs* v. *Briggs*, 4 Haw. 448, decided in 1882, to the case of *McCandless* v. *Honolulu Plantation Co.,* 19 Haw. 239, decided in November, 1908, this court has uniformly refused to set aside the decision of a circuit judge, jury waived, where there was evidence to support it. Upon and since the amendment (Act 117, S. L. 1909) circuit courts pursuant thereto have included in their decisions their "reasons" therefor in the nature of findings of fact and conclusions of law and this court consonant with its earlier decisions has consistently accorded similar respect to the findings of fact contained therein when sustained by the evidence. *Paris* v. *Kuhaupio,* 19 Haw. 657; *Miller* v. *Charman,* 20 Haw. 165; *Hau* v. *Palolo Land Co.,* 20 Haw. 172; *Nahaolelua* v. *Heen,* 20 Haw. 613; *Schoening & Co.* v. *Miner,* 22 Haw. 196; *Akatsuka* v. *McKay,* 24 Haw. 600; *Whitford* v. *Kahananui,* 24 Haw. 667; *Moses* v. *Nobriga,* 25 Haw. 483. Hence where the evidence is conflicting findings which have for their support evidence more than a mere scintilla, that is, evidence of a character sufficiently substantial as to warrant the court as trier of the facts, in view of all the circumstances of the case, in finding from it the fact to establish which the evidence was introduced (*Holstein* v. *Benedict,* 22 Haw. 441), will not be disturbed. This conflict necessarily involves the credibility of witnesses, with which this court has no concern. Nor upon the exception to the decision is the preponderance of evidence a subject of review.

Moreover, upon writ of error—the method of review employed upon this appeal—the statute (Sec. 2523, R. L. 1915, as amended by Act 44, S. L. 1919,) specifically provides that there shall be no reversal of any finding de-

pending upon the credibility of witnesses or the weight of evidence. The effect of this is to resolve the alleged errors assigned to findings of fact into the simple question of whether the findings complained of are sustained by evidence more than a scintilla. *Hang Fook* v. *Republic of Hawaii,* 9 Haw. 593; *Vierra* v. *Hackfeld,* 8 Haw. 436; *Pahukula* v. *Maguire,* 9 Haw. 630; *Akatsuka* v. *McKay, supra; In re Title of Kioloku,* 25 Haw. 357; *Territory* v. *Gay,* 26 Haw. 382. If the findings of fact are sustained by evidence they must be approved and if approved the next step logically is to determine whether upon these findings of fact the court came to correct conclusions of law. The several assignments will hence be taken up in the order hereinbefore indicated, considering first those which involve purely findings of fact followed by a consideration of those findings which involve conclusions of law thereon.

Assignments of error numbers 3, 19 and 20 attack the findings of the court as to the motives which actuated the deceased in making the deeds in question.

It appears from the evidence that T. K. Lalakea was a native of the Islands, born on Hawaii, and at the time of his death about seventy years of age. His family consisted of a wife and eight children—two sons and six daughters—two of the latter predeceasing the intestate, leaving children surviving. His wife died in August, 1914. The defendant was the oldest child, being twenty-nine years of age at the time of his father's death. The other son was the fourth in age. The daughters who survived him were all married except the youngest child who died intestate shortly after her father. The deceased was engaged during his lifetime in buying and selling real estate. He started in with nothing and prior to the disposition of his property in March, 1915, was worth in real estate in excess of $100,000. He had been treasurer of the County

of Hawaii.   O. T. Shipman, an attorney at law, an old
friend and legal adviser of the deceased for some four
years prior to his death, prepared and delivered to the de-
ceased in December, 1914, at the latter's request, drafts
of six deeds purporting to convey all his real estate to his
children, including the deed to his son, the defendant,
which conveyed to the latter the bulk of his property.  Mr.
Shipman, called as a witness for the plaintiff, explained
the circumstances of the preparation of these deeds as
follows:   (The questions and answers as propounded to
this witness as well as to the witnesses whose evidence
will be hereafter referred to are not quoted in full.   A
narrative form in the first person is employed, the exact
language of the witnesses being observed as far as it is
possible.)   I recollect in March, 1915, when I drew up
some instruments for Mr. Lalakea—there were six—I
had several conversations with him at that time—the con-
versation was in reference to the disposition of his prop-
erty,—a case which was pending in which he was con-
nected through his office as county treasurer, and that
was all brought out during the conversation—the pending
action I have in mind was a suit brought, I think, by The
First Bank of Hilo involving Mr. Lalakea in his capacity
as county treasurer—I could not give you the title of the
case,—he was interested in it as one of the defendants, he
and Charley McGuire—there had been several consulta-
tions prior to the time in December when I finally de-
livered the draft of the acknowledgments—it had been
pending for several months—as a result of these conver-
sations I drafted a half dozen deeds,—the matter had
been going on for months prior to the month of December
when I delivered these documents to Mr. Lalakea—I was
trying to devise some way of disposing of his property
and I tried on several occasions to put them in shape the
way I understood he wanted them and it would be some-

thing else and finally I hadn't the patience to continue any longer and drafted these and gave them as you find them—he prepared the schedule of twenty-five pieces of property found in his deed to the defendant, at least most of them, although I may have picked out one or two, but most of them were given to me by him.

This decision of T. K. Lalakea to dispose of his property *inter vivos* was indicated first after the death of his wife, her demise, no doubt, having impressed him with the uncertainty of life, especially at his age. Both his daughter Mrs. Aona, a witness called for the defendant, and the defendant himself referred in detail to a family gathering the day after the mother's death where each member of the family except the son George was present and was consulted by the father as to his or her preference for any specific piece of real property which he then owned.

Assignments of error numbers 7, 9 and that portion of number 22 which refers to the execution of the alleged deed to the defendant challenge the findings of the court as to the physical condition of the grantor at the time of the execution of the deed in question and thereafter until his death.

Mr. Shipman, the witness heretofore referred to, testified: Of course he had been in failing health for some time—I think he was seventy years old or more, at least seventy.

The plaintiff whose intimate observations are confined to the two weeks that she resided in her father's home prior to her father's death, although she previously called at the home almost daily, testified: My sister Hannah (Mrs. Makainai) prior to February, 1915, wrote to the defendant, who was then working in the Honolulu post office, to come home on account of the poor health of my father.

The family was evidently exercised over the old gentleman's health and feared to alarm him about his condition, for the same witness testified: Hannah wrote him (referring to the defendant) to come home on account of the poor health of my father—my father didn't request her to write—it was her own volition that she wrote the letter to Solomon to come home—we talked it over between us on account of my father's bad health that she would send for him and after she wrote the letter to have him come up—we did this because he was sick—we wanted him to come up and see the condition which father was in—our father was sick and I and Mrs. Makainai thought it best to have Solomon come up and attend to the business so as to relieve him of the necessity of doing business—after Solomon came back he took charge of father's business— my father had trouble with his foot—one sore foot—he had to be lifted out of bed and put in a chair—on the day he died we lifted him up.

Mrs. Makainai's husband called as a witness for the plaintiff testified: He was getting a little weaker from time to time until his death—the reason that Solomon came home was my wife told me to write to him to come back because my wife wanted someone to be with the old man all the time,—wanted him to take care of the old man,—to be with the old man all the time—during the month of March Solomon was attending "to the business of the old man" also in February, from the first of February up to the time that the father died, he was with the old man all the time.

The letter referred to by Mrs. Hewahewa, Mrs. Makainai and the latter's husband evidently miscarried. The defendant testified that he never received it.

Solomon Lalakea, the defendant, testifying as to his father's condition during this period, said: I learned of the condition of my father's health in January, 1915,

when I received a letter from him—I arrived here on the 2d day of February, at least during the first week of February—I returned to my father's home because my father wrote me to come home because he could not attend to his business very well and I was the only son competent to help him work in his business—I had seen him previously in August, 1914, at the time my mother died—there was a big difference between the condition of his health then and when I returned in February—he could go about and do his business as usual in August but he couldn't in February—during the first week in February I went around with him once and during the second week I went with him to Waiakea in an automobile—when I came back I started right in to attend to my father's business collecting rents and such.  On the 6th of March he was sick—sore in the legs—it commenced with a blister and he got a knife and cut his foot—indigestion troubled him—as to walking the condition of his legs was such that we had to hold him sometimes—that commenced during the last week of February,—around there—there was a big difference between his condition in March compared with the time that I came home in February—he had a sore foot, it was swollen up—he could not walk— he just could drag along a little bit with a crutch and we had to hold him most of the time—sometimes he would sit on the chair but we had to hold him—he never moved about the house without assistance when he got the sore foot—that was because he could not step on his sore foot —he had to go around with a crutch—my sister and I and sometimes Mrs. Hewahewa would come in town and look after him—someone was with him all of the time—he could not be left alone.

The condition of health of the deceased after March 6, however, was only material so far as it reflected his condition on that day.  His condition of health on March

6 was an issue and hence a finding upon that issue would be a "reason" for the court's decision within the meaning of Section 2380, R. L. 1915. His condition after March 6 was not an issue to the extent of requiring a finding thereon by the trial court.

Obviously the physical condition of the deceased on March 6, 1915, was such as to require assistance in writing. Moreover, he requested assistance as testified to by his son Solomon and the witness Namahoe, whose evidence is detailed in the consideration of the next succeeding assignments of error.

Assignments numbers 4, 5 and 6 concern the findings of fact of the trial court that T. K. Lalakea manually signed the deeds drafted by Mr. Shipman, including the alleged deed to the defendant, in the presence of the defendant Solomon K. Lalakea and Namahoe.

The only eye-witnesses to the execution of the deed in question were Solomon and Namahoe, an old friend of the decedent.

The defendant testified: On the 6th of March my father told me to get Namahoe to come to the house—I went out to look for Namahoe—this was some time before lunch—when I went out to look for Namahoe I think my sister Mrs. Makainai was attending my father—I found Mr. Namahoe, who is employed by the county as fish inspector, at the Aloha market—I returned to the house alone—when I came back my father told me to get these papers,—the deeds—they were lying in my father's bureau which was in his bed-room, held together by a rubber band—I got those papers and handed them to my father and he unfolded them so that when Namahoe got to the house the papers were already opened—my father then told me that Mr. Shipman had prepared those deeds —this was the first knowledge I had of them further than that I saw them in my father's bureau—my father told

Namahoe that he wanted him to be a witness to this deed
—my father was sitting on the rocking-chair at the head
of the table, Namahoe on the Hamakua end sitting down—
my father first made an attempt to sign the papers with-
out my help—the signature "T. K. Lalakea" written in
pen and ink before the word "Seal" at the end of exhibit
"A" (the deed to the defendant) was written by my
father and I—the words "D. Namahoe" were written by
Namahoe and I wrote my name "Solomon K. Lalakea"
underneath—the circumstances of my assisting my father
in writing his name were that he made a "T" and then
could not control it with his hand so he told me to help
him in order to write his name—when he made the letter
"T" he could not write very good and he told me to hold
his hand so that he could write the letters—he used an
ordinary pen and ink that he had in the house—Namahoe
used his fountain pen in signing his name—I wrote my
name with Namahoe's pen—my father held the pen like
this (showing)—I came on this side and held his hand
to guide it along—all of the signature of T. K. Lalakea
was made in that way—there were five or more papers
signed at that time—I don't know the exact number of
papers—they were all signed in this way with my assist-
ance.

Namahoe testified: I was called in by Lalakea in re-
spect to these deeds in March, 1915—he was sick—before
I went there he was feeble or sick—Solomon came for me
—when I got to the house I saw Solomon and Kanamu
(the name by which T. K. Lalakea was known among
the Hawaiians—I had a talk with Kanamu—he was sit-
ting up—he told me for what purpose he had called me—
there were certain papers on the table and he told me
that he wanted me to sign my name to them—wanted me
to sign the papers—he told me that those were papers for
the division of land among his relatives—I wrote the name

"D. Namahoe" on Exhibit "A"—(deed to defendant) the name "Solomon K. Lalakea" was written by Solomon—the name "T. K. Lalakea" was written by him and the boy—when he started to write on this from what I saw he didn't think he would be able to write on it—he started writing—he thought he couldn't,—he was feeble—I think he wrote this letter "T" without the assistance of his son—after he got the "T" down he asked the boy to come and help him—the boy came and helped him—Kanamu held the pen—Solomon put his hand on the hand of Lalakea and guided the pen—Kanamu signed the deed first—I don't know which of the deeds was first to be signed by Lalakea—he gave them to me to sign—I don't know which was the first one—I don't remember how many I signed—Lalakea signed exhibit "D" (deed from T. K. Lalakea to George Lalakea, dated March 6, 1915, recorded May 11, 1915, in the office of the registrar of conveyances of the Territory in Liber 428, pages 127-129)—all of the deeds that were signed there that day were signed in the manner described with the assistance of Solomon.

Assignment number 10 refers to the finding of the court that among the deeds signed on March 6, 1915, was one to the plaintiff conveying the property in question.

This is evidently a mistake in the use of the term "plaintiff" instead of "defendant." Neither the pleadings nor the evidence disclose any reference to or contention made that the grantor signed a deed of the premises in question to the plaintiff while the evidence is all to the effect, in fact there is no dispute, that the deed to the defendant was one of six signed and executed by the decedent on March 6, 1915.

Assignments numbers 13, 14, 15 and 16 refer to the findings of the court on the absence of fraud in respect to the signing of the deed in question.

The court found that the defendant did not forge the

signature of his father but that his father's signature was the result of the latter's act. This finding naturally results from the finding that the deed in question was signed by T. K. Lalakea with the assistance of his son, and that finding being sustained by the evidence these findings must also be sustained.

The evidence was sufficient to overcome any presumptions of fraud that might arise from the relation existing between the parties to the deed in question. There was no direct evidence to the contrary. Whatever contrary inferences might be drawn from the other evidence adduced was a question for the trial court to determine. By its decision it apparently refused to adopt any inferences contrary to the direct evidence of the witnesses Namahoe and Solomon Lalakea. Its determination in that regard is not subject to review.

This brings us to a consideration of the trial court's conclusion of law that T. K. Lalakea signed and executed the alleged deed of March 6, 1915.

Assignment number 1 which is involved hereunder is as follows:

"That the said court committed error in its ruling, decision and finding whereby the said court found and decided that T. K. Lalakea signed and executed a certain document dated March 6, 1915 (admitted in evidence and marked Plaintiff's Exhibit 'A'), alleged to be a deed of certain lands therein mentioned to the said Solomon K. Lalakea, defendant."

It requires no citations of authority to sustain the statement that a signature to a document is no less that of the signer even though in affixing his signature he was assisted by another at the former's request. As a result, the legal conclusion that the deceased signed and executed the deed in question is inevitable.

2. Did T. K. Lalakea deliver said alleged deed to the defendant?

Assignments numbers 17, 8, 10 and a portion of 22 challenge the correctness of the findings of fact as to the delivery of the deed in question.

The witness Namahoe testified: After we all got through signing them—those papers were given by Kanamu to Solomon—he told Solomon to be very careful and to keep these carefully—he told him to be very careful of them so as not to lose them—he says: "After I die then these papers will be taken and sworn to or acknowledged and then delivered to those that the papers belong to, those individual papers."

The defendant Solomon Lalakea testified: After all of the papers had been signed by my father and Namahoe and myself as witnesses my father gave them to me,—all of them. He told me to take care of those papers after his death,—to have them acknowledged and give each to all of the children. When my father gave them to me I took them, put them in a document box made of tin, enclosed the tin box in a pasteboard shoe box and put it on the shelf in the dining-room—kitchen—behind the door— I didn't give them back to my father,—from the 6th of March down to the time when my father died those papers were on the little shelf there—I didn't touch them until after my father's death—just before his death he told me not to forget his instructions—after my father's death I got the deeds from the box, wrapped them in a cloth and went over to Mr. Shipman's office—I didn't find Shipman in at the time—I then went to Judge Wise's office—after my father's death I understood that something was necessary to be done. I believed my father wanted me to have the deeds acknowledged in the record and give them to each of the children—that was the reason I did as I did. After the deeds were signed my father passed them over to me and I folded them—I knew the contents of them— then I took the same rubber band which previously en-

circled them and put it around them and put them in the
tin.   I went to Mr. Shipman's because I wanted him to
acknowledge the paper—when my father told me to keep
the deeds, to have them acknowledged after his death he·
used the word "hooiaio" is Hawaiian and means to
acknowledge before a notary public—I went before Judge
Parsons to acknowledge the deeds.

As to the court's finding upon acknowledgment of
the deeds.

Judge Parsons pursuant to section 3105, R. L. 1915,
issued the following certificate which is attached to the
deed in question:

"On this 8th day of May, A. D. 1915, before me,
Charles F. Parsons, judge of the circuit court; 4th circuit
of Hawaii, personally appeared D. Namahoe and Solomon K. Lalakea, both of Hilo, Hawaii, satisfactorily
proved to me to be the same persons whose names are
subscribed to the within instrument as witnesses thereto
by the oath of W. S. Wise, a credible witness for that
purpose, who being by me duly sworn did severally depose and say that they reside in Hilo in the County and
Territory of Hawaii; that they both were present and
saw T. K. Lalakea who was personally known to each of
them to be the same person described in and who executed
the annexed instrument, freely and voluntarily sign, seal
and deliver the same, and that they, the deponents, each
thereupon and at the request of the said T. K. Lalakea
subscribed their names thereto as witnesses."

The court was in error in finding that the "heirs" appeared with Solomon K. Lalakea and the other witnesses
before Judge Parsons when the execution of the deed was
proved.   The only persons present outside of the judge
were Solomon and Namahoe and the former's attorney.
The finding, however, was immaterial.   Their mere presence could not work an estoppel.   No significance was
attached to the finding as far as the decision discloses
and it appears to be nothing more than a harmless mis-

statement of the evidence.   "Where the judgment is supported by proper findings, it is not vitiated by findings on immaterial points   *   *   *   as such findings may be treated as surplusage."   4 C. J., title "Appeal and Error," Sec. 3041, p. 1057.

All of the deeds were sent by Judge Wise to the registry office in Honolulu for record and those that have been admitted in evidence bear the indorsement of having been offered for record on May 11, 1915.

From the foregoing references to the evidence it is apparent that there was a present intention in the grantor to convey absolutely without reservation.   The liability to indemnify the county for loss occasioned by the defalcations of the decedent's deputy while the former was treasurer of the County of Hawaii, the advanced age of the deceased, the form of deeds hereinafter referred to which must have in the main reflected his intention, his failing health, his declarations to Namahoe, his instructions concerning acknowledgment, his delivery of the deeds to his son, all indicate that on March 6, 1915, at the time of the execution of the various deeds to his children, including the deed in question, there was a present intention of absolute conveyance without reservation except as expressed in the deed.

Assignment number 12 challenges the correctness of the finding of the trial court that the plaintiff as well as the defendant enjoyed the benefits of the gift made to her by her father on March 6, 1915.

This finding is error.   There was no evidence nor any claim made by the defendant that the plaintiff had accepted the benefits under her deed.   The finding, however, was immaterial and hence not prejudicial.   The acceptance by the plaintiff under her deed would not have estopped her from attacking the due execution and delivery of the defendant's deed.

Assignments numbers 2 and 18 attack the conclusion of law found by the trial judge that there was a legal delivery to defendant of the deed of March 6, 1915. They are as follows:

"Assignment No. 2. That the said court committed error in its ruling, decision and finding whereby the said court found and decided that the said T. K. Lalakea delivered a certain document dated March 6, 1915 (admitted in evidence and marked Plaintiff's Exhibit 'A'), alleged to be a deed of certain lands therein mentioned to the said Solomon K. Lalakea."

"Assignment No. 18. That the said court committed error in its ruling, decision and finding whereby the said court found and decided that 'The court is, therefore, bound to accept the testimony as presented, and conclude that the deed in question was legally delivered by the said T. K. Lalakea to the defendant, Solomon K. Lalakea, in full satisfaction and contemplation of the laws of this Territory, and for the purposes as set out in the deed itself.' "

A deed in order to be effectual as a transfer of title to land must be delivered. Delivery may be made by words with act, by an unequivocal act only, or by both combined. In order to be a valid delivery it must appear that the grantor parted with all dominion and control over the deed. *Porter* v. *Woodhouse,* 59 Conn. 568, 574; *Shults* v. *Shults,* 159 Ill. 654, 660. No particular form of delivery is essential. The question of delivery is one of intention. Whether such intent actually existed is a question of fact to be determined by the circumstances of each individual case. What amounts to a delivery is a question of law, but it is more often a question of fact whether delivery was made.

The court found as facts a manual delivery coupled with the intent in the grantor to part with all dominion and control over the deed and to make the same effective

as a present conveyance of the premises subject thereto. This in law amounts to a delivery.

A matter not touched upon by the trial court but which we consider significant upon the question of intent is the reservation to the grantor of a life estate in the premises conveyed. Where a deed contains a reservation of a life estate in the grantor such fact raises a strong presumption that it was intended that the title should immediately vest in the remainderman. *German Am. Nat. Bank* v. *Martin,* 277 Ill. 629, 645; *Sargent* v. *Roberts,* 265 Ill. 210, 219.

3. Is the alleged conveyance to the defendant a will or a deed?

Our conclusion that the facts sustain the finding that the grantor delivered the deed in question to his son with the intent to part with all dominion and control over the deed to him and that said deed was effectual as a present absolute conveyance of the premises subject thereto, renders it unnecessary to discuss plaintiff in error's assignments to the findings of the trial court as to the grantor's intentions (assignment No. 21) and its conclusion (assignment No. 23) that the conveyance in question was not testamentary—was not a will but a deed.

Assignments numbers 24, to the final conclusion of the court that the plaintiff had failed to establish her case, and 25, to the order for judgment, are general assignments and are disposed of by our conclusions upon the specific assignments involved therein.

4. Was the trial court bound by its judgment in favor of plaintiff in the case of Jessie Makainai *v.* Solomon Lalakea?

Assignment number 26 is as follows:

"That the said court committed error in its ruling, decision and finding whereby the said court in its findings

and decision refused to follow and be bound by the decision and judgment against the defendant, Solomon K. Lalakea, made and entered in a certain case entitled 'Hana Makainai, Plaintiff—vs.—Solomon K. Lalakea, Defendant,' an action of ejectment lately tried and decided in the same court involving a similar undivided interest in the same lands as are the subject of the case at bar under a common source of title."

This assignment brings up a novel question. In the case of Makainai v. Lalakea, which was an action of ejectment for the possession of an undivided one-seventh part share or interest in the same land involved in this case, derived from a common source of title, the Honorable Clement K. Quinn, then judge of the fourth circuit court sitting without a jury, held that the deed of March 6, 1915, to the defendant, under which he claims herein, had not been signed by the grantor but by someone else without his knowledge or consent—in other words, that the signature of the grantor was a forgery, and that said deed had never been delivered by the grantor to the grantee and ordered judgment accordingly for the plaintiff. In this case similarly as in that case defendant's claim of title depends entirely upon the due execution and delivery of this same deed. In this case similarly as in that case plaintiff claims that the deed of the defendant was neither executed nor delivered by the grantor. The court in the instant case sitting without a jury found that the deed to the defendant had been executed and delivered by the grantor and accordingly ordered judgment for the defendant. The judgment in the *Makainai* case upon error was affirmed by this court. Finding as we do that the evidence in this case sustains the findings of the trial judge we have the apparently anomalous situation of this court sustaining absolutely opposite findings upon the same subject-matter. We are impelled to this position, however, for two reasons, first, that the plaintiff in the

instant case failed to raise in the trial court the objection raised here for the first time, that the judgment in the *Makainai* case was binding upon the plaintiff Hewahewa in this case, and second, conceding that the trial court could have taken judicial notice of the proceedings in the *Makainai* case the judgment in the *Makainai* case is not *res adjudicata* in this case for the reason that no privity exists between the plaintiff in the *Makainai* case and the plaintiff in this case.

The record nowhere discloses that the claim of *res adjudicata* was raised by the plaintiff in the trial court. On the contrary, when the deed of the defendant of March 6, 1915, was offered in evidence in this case by the defendant the plaintiff interposed mere general objections thereto and in no way intimated that she contended that the judgment in the *Makainai* case was conclusive upon the defendant in this case. The following excerpt from the transcript of evidence explains the situation:

"Mr. Carlsmith. If the court please, we offer in evidence a certified copy of deed of T. K. Lalakea, dated March 6, 1915, to Solomon K. Lalakea, conveying in all twenty-five separate pieces of property, which instrument was on the 8th of May, 1915, approved before the Honorable Charles F. Parsons, judge of the circuit court of the fourth judicial circuit, and which instrument was duly recorded in the office of the registrar of conveyances in Book 428, on pages 122 and 127. Mr. Russell. The plaintiff objects to this instrument in evidence upon the general ground that it is incompetent, and more specifically that the instrument appears on the face thereof to have been an attempt at a testamentary disposition of the property therein referred to. That will be one of the chief issues, if the court please, in the case; and I think a pro forma ruling overruling the objection will give us an opportunity to go into it more thoroughly. The court. At the suggestion of the attorney for plaintiff, the objection is overruled. Mr. Russell. And we take a formal exception."

Moreover, plaintiff on rebuttal offered evidence to the effect that the signature of the grantor in such deed was a forgery and that the deed had never been delivered. No offer was made by plaintiff of the record in the *Makainai* case. It was not made a part of the record in the court below nor is it made a part of the record on appeal in this case. No suggestion was made to the trial court that it take judicial notice of the record in the *Makainai* case. And finally the trial court specifically states in its decision that it had considered and passed upon singly every material point raised in the case but the decision is silent upon the question of *res adjudicata.* Had the question been raised the defendant would have been entitled to, and could have insisted upon, a finding on this question as one of the court's "reasons" for its decision within the meaning of section 2380, R. L. 1915. No complaint was made in the court below nor is any complaint made here that the trial court in rendering its decision did not comply with the statute. It does not appear that the question was ever raised before the trial court or that the trial court ever had an opportunity to pass upon it. The burden of proving a former adjudication is upon the party setting it up. *Lau Lam* v. *Whitcomb,* 21 Haw. 252, 255; *Macedo* v. *Macedo,* 22 Haw. 429.

It has been too often held in this jurisdiction to be now a subject of discussion that this court will not consider upon appeal questions not raised below.

But conceding that the trial court could have taken judicial notice of the proceedings previously had before it in the *Makainai* case and that this court may similarly take notice of the record here on appeal in that case we find that the evidence in the *Makainai* case and the evidence in this case are not the same. While the ultimate questions of fact are the same the evidence in support or in opposition thereto is different.

Were this action between the same parties as in the *Makainai* case or their privies, the questions of execution and delivery having been necessary to the ultimate decision of the court in the *Makainai* case, the court's findings thereon would be *res adjudicata* in this case. But "to constitute a judgment an estoppel there must be an identity of parties as well as of the subject-matter; that is, it is necessary that the parties as between whom the judgment is claimed to be an estoppel must have been parties to the action in which it was rendered in the same capacities and in the same antagonistic relation or else they must be in privity with the parties in such former action." 23 Cyc., title "Judgments," par. B, p. 1237. See also *In re Kealiiahonui,* 9 Haw. 1, 2; *George* v. *Holt,* 9 Haw. 47; *Castle* v. *Kapiolani Est.,* 17 Haw. 61, 63; *Tibbetts* v. *Damon,* 17 Haw. 203; *McCandless* v. *Castle,* 25 Haw. 22, 34. Obviously there are not the same parties in this case as in the *Makainai* case. Nor is the plaintiff in privity with the plaintiff in the *Makainai* case. Had the grantor, T. K. Lalakea, died intestate as to the premises involved in these suits Mrs. Makainai and Mrs. Hewahewa would be tenants in common therein. But there is no privity of estate between tenants in common. 23 Cyc., title "Judgments," p. 1256, par. e; 15 R. C. L., title "Judgments," Sec. 507; *Keelikolani* v. *Robinson,* 2 Haw. 522, 524. Their interests are separate and distinct. *Godfrey* v. *Rowland* (dissenting opinion), 17 Haw. 577, 591.

Under the circumstances the judgment in the *Makainai* case is not *res adjudicata* in this case. See *Allred* v. *Smith,* 135 N. C. 443, 47 S. E. 597, 65 L. R. A. 924.

Finding as we do that the findings of fact contained in the decision of the trial court are amply sustained by the evidence and that its conclusions of law thereon are

correct the judgment below must be affirmed and it is so ordered.

*H. Edmondson* (*Lightfoot & Lightfoot* with him on the briefs) for plaintiff in error.

*W. H. Smith* (*C. S. Carlsmith* with him on the briefs) for defendant in error.